# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Richard Donald Miller,                      Civ. No. 12-2545 (DSD/JJK)

     Plaintiff,

v.

Carolyn W. Colvin,                          **REPORT AND**
Acting Commissioner of Social Security,[1]  **RECOMMENDATION**

     Defendant.

---

Monica C. Fahnhorst, Esq., and Peter W. Carter, Esq., Dorsey & Whitney LLP, counsel for Plaintiff.

Ana H. Voss, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

     Pursuant to 42 U.S.C. § 405(g), Plaintiff Richard Donald Miller seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability insurance benefits and supplemental security income.  The parties have filed cross-motions for summary judgment.  (Doc. Nos. 21, 25.)  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. L.R. 72.1.  For the reasons stated below, this Court recommends that

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the Defendant in this action.

Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

## BACKGROUND

### I.    Procedural History

Plaintiff protectively filed applications for disability insurance benefits and supplemental security income in September 2007, alleging a disability onset date of August 5, 2005.  (Tr. 80–89.)  The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.  (Tr. 48–52, 58–64.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and the hearing was held on March 11, 2009.  (Tr. 54–56, 23–43.)  On June 23, 2009, the ALJ issued an unfavorable decision on Plaintiff's applications.  (Tr. 9– 22.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on September 23, 2009.  (Tr. 5–8.)  Denial by the Appeals Council made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981; 416.1481.

Plaintiff sought review in the United States District Court, District of Minnesota, and the parties consented to jurisdiction with Chief United States Magistrate Judge Arthur J. Boylan.  (Tr. 464.)  On March 22, 2011, the Court granted Plaintiff's alternative request for remand, and ordered the Commissioner to do the following: (1) take and consider the additional evidence produced by Plaintiff; (2) take and consider all additional evidence created since the Commissioner's denial of Plaintiff's applications; (3) to the extent necessary, take

and consider any additional evidence including but not limited to contacting

medical sources or obtaining additional consultative examinations; and (4) after

consideration of the aforementioned evidence, modify or affirm the

Commissioner's findings of fact, decision, or both.  (Tr. 491.)

A second administrative hearing was held on August 8, 2011.  (Tr. 407–

40.)  On October 31, 2011, the ALJ issued a decision unfavorable to Plaintiff.

(Tr. 380–406.)  The Appeals Council denied Plaintiff's request for review on

August 23, 2012, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 376–79.)  Plaintiff filed this action on October 4, 2012.  (Doc.

No. 1, Compl.)  Thereafter, Defendant filed an Answer and a certified copy of the

Administrative Record.  (Doc. Nos. 8, 9, 12.)  Pursuant to D. Minn. LR 7.2, the

parties then filed cross-motions for summary judgment.  (Doc. Nos. 21, 25.)

## II.    Background

Plaintiff was born on February 14, 1961, and on his alleged disability onset

date of August 5, 2005, he was 44 years old.  (Tr. 80.)  Plaintiff is a high school

graduate, and he also received a certificate from Normandale College.  (Tr. 200.)

Plaintiff has work experience in customer service jobs, last working on July 31,

2006.  (Tr. 122–23, 580.)  Plaintiff alleges that he is precluded from working due

to bipolar disorder, low stress tolerance, difficulty getting along with people, poor

concentration and memory, poor circulation, diabetes, throat problems, pain,

tingling, and numbness.  (Tr. 122.)

### A.   Medical Records

### 1.   Mental Impairments

The record reflects that on April 13, 2006, Plaintiff underwent a diagnostic assessment with Richard Powell, a licensed psychologist, at Prairie Center Counseling.  (Tr. 694–96.)  At that time, Plaintiff reported the following.  He was single, unemployed, and had lived with his sister for the last ten years.  (Tr. 694.)  He never held a job for more than seventeen months, and in response to his sister threatening to kick him out of her house, Plaintiff said he could not survive on his own and "might have to do something bad."  (*Id.*)  He had tried to get committed at Hennepin County Medical Center, but he was denied.  (*Id.*)  He reported that he had been feeling suicidal and had access to pills.  (Tr. 695.)

On examination, Powell noted that Plaintiff's general behavior and manner were appropriate; his motor activity was normal; he had a limited range of affect; his thought content was marginal; he expressed suicidal ideation, but possibly as a means of seeking hospitalization; his motivation for treatment was limited; he was oriented; his speech was normal; he had some difficulty collecting his thoughts and focusing his concentration; and his problem solving was limited, but his "fund of knowledge" seemed to be good.  (Tr. 695–96.)  Powell diagnosed Plaintiff with generalized anxiety disorder and assessed a GAF score of 45.[2]

---

[2]   The Global Assessment of Functioning ("GAF") scale is used by clinicians to rate the social, occupational, and psychological functioning of adults. *Diagnostic and Statistical Manual of Mental Disorders* 32 (American Psychiatric
(Footnote Continued on Next Page)

(Tr. 696.)  Powell also referred Plaintiff to Dr. Bruce Meyer for medication evaluation.  (*Id.*)

When Plaintiff saw Dr. Meyer on April 13, 2006, Plaintiff told Dr. Meyer he was upset because his sister wanted him to move out at the end of the month. (Tr. 703.)  Plaintiff stated he had been fired many times from a number of retail cashiering and customer service jobs, and reported that he had chronic depression and insomnia.  (*Id.*)  Plaintiff stated that he tended to isolate himself and did not have any close friends, and that he had tried medications but quit without any real reason.  (*Id.*)  On examination, Dr. Meyer noted that Plaintiff was anxious, somewhat passive, hopeless, and had a tendency toward being dependent, with poor self-esteem and poor motivation.  (Tr. 704.)  Dr. Meyer also noted that Plaintiff was not suicidal, delusional, or paranoid; his memory was intact; and his intellectual functioning was in the average range.  (*Id.*)  Dr. Meyer diagnosed Plaintiff with depression and anxiety disorder, and he prescribed clonazepam and Celexa.  (Tr. 704–05.)

Plaintiff reportedly felt better when he followed up a week later because he had found a part-time job as a security guard.  (Tr. 692, 701, 915.)  He also reported that he was sleeping better at night using clonazepam.  (Tr. 701.)  In

_____

(Footnote Continued from Previous Page)
Association 4th ed. text revision 2000) ("DSM-IV-tr").  Scores from 41 to 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.* at 34.  Scores from 51 to 60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

addition, Plaintiff's sister agreed to let him stay at her house a little longer.

(Tr. 692.)

On May 24, 2006, Plaintiff transferred his care to Margaret Waller, a

licensed psychologist at Prairie Center Counseling.  (Tr. 689.)  Upon meeting

with Plaintiff, Waller wrote:

> He stated that he does feel sad sometimes and currently has low
> energy.  He also acknowledged anger and hopelessness and poor
> concentration.  We did focus quite a bit on the anger as that came
> out in quite a few ways as he was describing what happened at work
> and how he relates to people he comes across, such as in grocery
> stores . . . . He also acknowledged worry and sometimes avoidance
> behavior.  His thought processes seemed appropriate, although his
> judgment may be a problem in terms of how he intervenes in
> situations that relate to other people . . . . He did acknowledge
> having some aggressiveness, compulsiveness, and hyperactivity as
> well as disorganized behavior, but only "a little."

(Tr. 689–90.)  Waller diagnosed Plaintiff with generalized anxiety disorder and

depression, not otherwise specified ("NOS"), and she assessed a GAF score of

48.  (*Id.*)  At their next session, on May 30, 2006, Waller assessed Plaintiff with a

GAF score of 50, noting that Plaintiff seemed "unfocused."  (Tr. 687–88.)

A month later, when Plaintiff then saw Dr. Meyer on June 28, 2006,

Plaintiff reported that he lost his new job in a restaurant because management

felt he was not learning fast enough.  (Tr. 697.)  Dr. Meyer noted that Plaintiff's

mental status was normal, with the exception of being moderately depressed and

having an anxious mood.  (*Id.*)  At that time, Plaintiff denied suicidal ideation, and

Dr. Meyer increased Plaintiff's citalopram (Celexa).  (*Id.*)

When Plaintiff saw Waller the next day, they talked about his history of losing jobs. (Tr. 684.) Plaintiff admitted he had difficulty trusting people and difficulty with authority. (*Id.*) He also stated he was worried about his finances because he could not pay his sister the rent he owed, and she was angry. (*Id.*) Plaintiff admitted he was thinking about suicide, and he stated that had sleeping pills he could take. (Tr. 685.) Waller assessed a GAF score of 42. (Tr. 686.) She then had police transport Plaintiff to Abbott Northwestern Hospital ("Abbott"). (Tr. 685–86.)

In the emergency room, Plaintiff's mood was depressed, he had a passive death wish, his affect was flat, but his speech and thoughts were normal, and his insight and judgment were fair to poor. (Tr. 954–55.) At that time, Plaintiff was admitted to the psychiatric unit. (Tr. 983.) He was given the MMPI-2 and MCMI-III psychological diagnostic tests. (Tr. 955–57.) The records reflect that the validity of the MMPI-2 test results was questionable because Plaintiff exhibited a very strong pattern of endorsing items that are not characteristically endorsed. (Tr. 956–57.) It was noted that there was a "very increased likelihood" that Plaintiff was overemphasizing symptoms or reporting symptoms that were not present. (Tr. 957.) The MCMI-III test resulted in a valid profile, although indicators suggested Plaintiff may have overstated certain items due to a tendency to be self-critical. (*Id.*) The test results led to a "most likely" diagnoses of major depression with suicide ideation and possible psychotic features, and mixed personality disorder with avoidant, dependent, and paranoid traits. (*Id.*)

During his stay in the psychiatric unit, Plaintiff was sometimes irritable, disruptive, and inappropriate.  (Tr. 964, 966.)  However, on July 1, 2006, a nurse noted that Plaintiff was in the lounge joking and laughing all day.  (Tr. 980.)  At that time, he was very chatty and social with everyone, his affect was very bright, and his manner was friendly and pleasant.  (*Id.*)  On July 11, 2006, Plaintiff was discharged without having anywhere to live; that made him angry and he refused to take his medications with him.  (Tr. 961.)  Dr. Saribalas noted upon Plaintiff's discharge that "[t]his [patient] is malingering and we have no evidence he is an immediate risk to society or himself . . ."  (*Id.*)

Plaintiff went to University of Minnesota Medical Center's Emergency Room ("Fairview") later that day, seeking admission because he was homeless, jobless, and had no reason to live.  (Tr. 727–34.) Upon interview with Dr. Dung Truong, Plaintiff reported that he had a history of not taking care of himself in terms of his diabetes, and Dr. Truong noted that he felt Plaintiff's "highly unusual fixated fear of being independent and not being cared for" bordered on delusional.  (Tr. 783, 785.)  Thereafter, Dr. Craig Vine assessed Plaintiff's mental health.  (Tr. 759–62.)  He noted that Plaintiff's speech was mildly pressured, he was alert and oriented, his psychomotor activity, language, thought process and associations were normal, his memory and fund of knowledge were intact, his attention and concentration were adequate, he endorsed suicidal ideation with a plan and paranoid thoughts, and his insight and judgment were mildly impaired.  (Tr. 761.)  Plaintiff told Dr. Vine that he would rather die than live in a shelter.

(*Id.*)  Dr. Vine provisionally diagnosed Plaintiff with bipolar affective disorder, NOS, with psychotic features, and personality disorder, NOS.  (*Id.*)  Dr. Vine also noted malingering as a possible diagnosis.  (*Id.*)  He assessed Plaintiff with a GAF score of 20[3] and admitted him on a 72-hour hold.  (*Id.*)  After the hold was lifted, and it was determined that Plaintiff was no longer an imminent danger to himself or others, Plaintiff was discharged on July 17, 2006. (Tr. 788.)  At that time he was irritable but not suicidal.  (Tr. 887.)

More than a year later, on September 18, 2007, Plaintiff saw Curtis Siegel, a licensed psychologist, at HealthPartners.  (Tr. 658.)  Plaintiff told Siegal that he had periods of depression after he was in the psychiatric unit in 2006.  (*Id.*)  Plaintiff also reported that others had suggested he might have ADHD because he does not listen well, his mind wandered, and he changed topics quickly while speaking.  (Tr. 658.)  During Plaintiff's visit with Siegal, he endorsed many depressive symptoms, but Siegal noted Plaintiff's mental status examination was normal.  (Tr. 660.)   Siegel diagnosed Plaintiff with severe major depression, and he noted he would consider bipolar disorder and ADHD.  (*Id.*)  He also assessed Plaintiff with a GAF score of 55–60.  (*Id.*)

---

[3]      GAF scores from 11-20 indicate some danger of hurting self or others or occasional failure to maintain minimal personal hygiene or gross impairment in communication.  *DSM-IV-tr* at 34.

Plaintiff returned the next month, primarily to address ADHD.  (Tr. 652–53.)

At that time, Siegal noted that Plaintiff's PHQ-9 score[4] was consistent with

moderately severe depression.  (Tr. 652.)  Plaintiff completed a semi-structured

interview regarding childhood ADHD symptoms and endorsed 4 out of 17

symptoms.  (*Id.*)  Plaintiff's symptoms as an adult were distraction, forgetfulness,

and difficulty waiting his turn.  (*Id.*)  Siegal noted that Plaintiff's mental status

examination was normal, diagnosed Plaintiff with major depression, recurrent

and severe, and he noted he would consider a diagnosis of ADHD.  (*Id.*)

On November 1, 2007, Siegel administered the PHQ-9 on Plaintiff, and

Plaintiff's score reflected mild depression.  (Tr. 650.)  In addition, based on a

written questionnaire, Plaintiff met the criteria for ADHD.  (Tr. 650–51, 681.)  On

examination, Siegal noted Plaintiff was neatly groomed with normal affect,

normal speech, logical and goal-directed thoughts, and Plaintiff's insight,

judgment, and cognition were intact.  (Tr. 650.)  Siegel diagnosed Plaintiff with

moderate major depression and ADHD, predominantly inattentive type.  (*Id.*)  At

that point, Plaintiff wanted to start therapy and look into ADHD workshops.

(Tr. 650–51.)

About two weeks later, Plaintiff underwent a consultative psychological

evaluation with Dr. Alford Karayusuf at the request of the SSA.  (Tr. 266–68.)

---

[4]     The PHQ-9 is a Patient Health Questionnaire used to screen for and rate
severity of depression.  *Patient Health Questionnaire (PHQ-9)*, Univ. of Mich.
Health Sys., http://www.med.umich.edu/1info/fhp/practice guides/depress/phq-
9.pdf.

Dr. Karayusuf had very few of Plaintiff's medical records available for review.

(Tr. 266.)  Plaintiff told Dr. Karayusuf he had diabetes and low back pain, and

that he was unable to find work.  (*Id.*)  He also said that he had nervous

breakdowns and was hospitalized in June and July 2006.  (*Id.*)  Plaintiff told

Dr. Karayusuf he was diagnosed with depression, but that he also had manic

episodes.  (Tr. 267.)  He stated his depressive episodes lasted two to four

weeks, during which he experienced poor motivation, unhappiness, inability to

get anything done, and suicidal thoughts.  (*Id.*)

Plaintiff also described his daily functioning for Dr. Karayusuf.  (*Id.*)  He

stated he lived alone and bathed once a week; he made his bed and prepared

meals every day; he grocery shopped twice a month; he used public

transportation; he did laundry once a week, but it hurt his back; he listened to the

radio and read; and he saw one friend three times per month.  (*Id.*)  In addition,

Plaintiff reported having some hallucinations.  (*Id.*)  On examination,

Dr. Karayusuf noted Plaintiff was oriented with good immediate recall, but that his

recent recall was impaired.  (*Id.*)  His intelligence was dull-normal and insight was

"uncertain."  (*Id.*)  And Plaintiff was cooperative and coherent, with appropriate

affect, mildly depressed mood, and normal psychomotor activity.  (Tr. 268.)

Dr. Karayusuf diagnosed Plaintiff with bipolar disorder, and he opined that

Plaintiff could follow simple instructions, interact with people in a brief and

superficial manner, and maintain persistence and pace.  (*Id.*)

## 2.    Physical Impairments

In April 2006, Plaintiff was diagnosed with diabetes.  (Tr. 717.)  Three months later, Plaintiff underwent a general medical evaluation while he was hospitalized in the psychiatric unit at Abbott.  (Tr. 959–60.)  At that time, Plaintiff complained of intermittent chronic back pain and intermittent discomfort in the right buttock, which he attributed to circulatory problems.  (Tr. 959.)  His physical examination did not reveal any abnormalities.  (*Id.*)  Plaintiff received diabetes education while in the hospital, but the records reflect he was uncooperative with staff's attempts to manage his diabetes.  (Tr. 964–67.)  When he was discharged on July 11, 2006, it was noted that he refused to take his diabetic supplies and medication.  (Tr. 961.)  Later that day, Plaintiff was admitted to Fairview and underwent a comprehensive physical examination.  (Tr. 752–54.)  There, Plaintiff's gait was normal, he had no joint inflammation, and his strength and sensation were intact.  (Tr. 753.)

The following year, on March 23, 2007, Plaintiff saw Dr. Charles Bass at HealthPartners, complaining of right foot pain, chronic low back pain, fatigue, shortness of breath, and recent leg pain.  (Tr. 668.)  Plaintiff stated he felt he was disabled by these symptoms and asked Dr. Bass to complete disability paperwork to help him obtain housing.  (*Id.*)  Dr. Bass noted that Plaintiff was in a homeless shelter and had been unable to work for many months, but that Plaintiff could not easily explain why he was unable to work for so long because his leg pain was "just a few months old."  (Tr. 669.)  On examination, Plaintiff's back had

good range of motion, but he was tender in the paralumbar area, and tender in the pelvis and ankle.  (*Id.*)  Dr. Bass noted that Plaintiff's foot pain was referred from his back, and that his exhaustion was likely related to depression because there was no physical etiology.  (*Id.*)

Plaintiff returned to Dr. Bass in September 2007, again requesting disability forms be completed for housing.  (Tr. 662.)  At that time, Plaintiff said he was not taking the medications prescribed to him when he was in the hospital for psychiatric treatment because he could not tolerate the medications and could not afford them.  (*Id.*)  Plaintiff also said his back pain made it difficult for him to pick up a bag of groceries.  (*Id.*)  On examination, Plaintiff's back was unremarkable, and his gait, reflexes, and sensation were normal.  (Tr. 664.)  Dr. Bass noted "likely bipolar and ADHD which untreated are more likely causes of disability then [sic] back pain."  (Tr. 664.)  Dr. Bass also noted that Plaintiff's diabetes was not controlled, and he prescribed metformin.  (*Id.*)  Dr. Bass completed a Medical Opinion form for Plaintiff, listing Plaintiff's diagnoses as chronic back pain, diabetes, bipolar disorder, and ADHD, and he concluded Plaintiff was unable to work into the foreseeable future.  (Tr. 361.)

The following month, Plaintiff saw Nurse Nancy Nelson at HealthPartners for diabetes education.  (Tr. 654.)  Nelsen noted that Plaintiff rode a bus to the library every day, but he was not very physically active.  (Tr. 655.)  In addition, under a heading in the treatment record "Barriers to care or learning," Nelson wrote "psychiatric disorder" and "financial."  (Tr. 656.)

13

On December 14, 2007, Dr. Dan Larson reviewed Plaintiff's social security disability file at the request of the SSA, and he completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (Tr. 288–95.)  Dr. Larson opined that Plaintiff could occasionally lift and carry fifty pounds; frequently lift and carry twenty-five pounds; stand, walk, and sit for six hours each in an eight-hour workday; had unlimited push or pull; and he had no postural, environmental, communicative, visual, or manipulative limitations.  (*Id.*)

On February 6, 2008, Plaintiff saw Dr. Bass and asked him to complete a disability form for medical assistance benefits.  (Tr. 308–11.)  Plaintiff reported that he was trying to find work but felt his back pain would not allow him to do so. (Tr. 309.)  Plaintiff told Dr. Bass he had lower back pain for a year, but he did not have any specific treatment for it.  (*Id.*)  Plaintiff also stated the pain worsened with bending, lifting, sitting, or standing.  (*Id.*)  Dr. Bass noted that Plaintiff's diabetes control was poor, and Plaintiff needed to follow up with a diabetes education nurse to consider the use of insulin.  (Tr. 308.)  He also noted Plaintiff had not been checking his blood sugars.  (Tr. 309.)

On examination, Dr. Bass noted Plaintiff was tender in the heel and lower back, but his leg reflexes and heel-toe walking were normal.  (*Id.*)  Dr. Bass diagnosed Plaintiff with diabetes with uncertain control, improved control over GERD (gastroesophageal reflux disease), chronic low back pain, heel pain that was likely bursitis, chest pain, and urinary frequency possibly related to anxiety or diabetes.  (*Id.*)  Dr. Bass also noted the following:

> I have completed a form.  It says that I am uncertain about his ability to work, but he might be able to work at low stress, no lifting position for four hours a day, but that it is unlikely.  I think that his primary problem with work is less the back pain than his personality disorder.

(*Id.*)  Dr. Bass also completed a Medical Opinion form for Plaintiff's application for county assistance, declaring that Plaintiff would be unable to work into the foreseeable future due to back pain and mental illness.  (Tr. 360.)[5]

At an appointment on May 2, 2008, Plaintiff complained to Dr. Bass of having intense calf pain for several days.  (Tr. 642.)  He stated he had been walking five to ten blocks per day without any problem.  (*Id.*)  Plaintiff's leg appeared normal, but Dr. Bass noted that Plaintiff's diabetes was poorly controlled, and that he did not keep his appointments with a diabetic education nurse.  (*Id.*)  Dr. Bass also noted that Plaintiff had a history of bipolar disorder and ADHD but had not kept his appointments with "Behavioral Health."  (*Id.*)  Dr. Bass noted that Plaintiff appeared anxious on examination, and noted that Plaintiff said he was looking for work and undergoing job training.  (*Id.*)

On August 6, 2008, Plaintiff saw Dr. Robert Goblirsch at HealthPartners. and complained of bilateral leg pain.  (Tr. 638–41.)  Dr. Goblirsch found no definite pattern linking Plaintiff's leg pain to his back pain, and Plaintiff's chronic low back pain was stable.  (*Id.*)  Dr. Goblirsch also found no evidence to suggest that peripheral vascular disease was the cause of Plaintiff's leg pain.  (*Id.*)  In

---

[5]     The Medical Opinion form (Tr. 360) does not contain the opinion described by Dr. Bass in his February 6, 2008 treatment record.

addition, he completed a Medical Opinion form for Plaintiff, opining that Plaintiff would be unable to work for the foreseeable future based on diabetes, chronic low back pain, and reflux disease.  (Tr. 359.)

Plaintiff underwent a routine checkup with Dr. Goblirsch on February 3, 2009.  (Tr. 634–36.)  At that time, Plaintiff's daily activity level was mostly sedentary, and his physical examination was normal.  (Tr. 635.)  Dr. Goblirsch completed a Medical Opinion form for Plaintiff that day, again stating Plaintiff would be unable to work for the foreseeable future.  (Tr. 358.)

Later that month, Plaintiff underwent a physical functional capacity evaluation with Dr. Fozia Abrar at Riverside Occupational and Environmental Medicine.  (Tr. 363–64, 626–33.)  Under the objective findings of Plaintiff's physical examination report, Dr. Abrar noted that Plaintiff was good at sitting to standing, walking, and reaching.  (Tr. 627.)  Dr. Abrar also noted that Plaintiff's balancing was fair, but that he was unable to squat, bend, or kneel.  (*Id.*)  In addition, Plaintiff's neck and back range of motion were good, and Plaintiff lifted a maximum of fifteen pounds in the clinical lifting simulation.  (Tr. 627–28.)

Dr. Abrar completed a "Functional Abilities Form" about Plaintiff, whereby she stated her opinion of Plaintiff's functional work capacity was based on medical records, patient history, and objective signs.  (Tr. 364.)  Dr. Abrar opined that Plaintiff could perform the following activities in an eight-hour workday:  sit two hours, stand one hour, walk one hour; occasionally push or pull and reach above shoulder level; seldom bend, stoop, or balance; lift fifteen pounds

occasionally; seldom carry twenty pounds; and he could never squat, crawl, climb ladders, crouch, kneel, or perform firm grasping with his hands.  (Tr. 363–64.)  On one copy of the report, just above Dr. Abrar's signature line and the date, there is the handwritten phrase "will not be able to work at all."  (Tr. 364.)

Plaintiff returned to Dr. Goblirsch on June 30, 2009, reporting that he was trying to diet and exercise for diabetes control.  (Tr. 623.)  At that time, Dr. Goblirsch completed another form for Plaintiff, "clarifying his status to remain out of work because of his chronic low back syndrome."  (Tr. 624.)  In October 2009, Dr. Goblirsch completed another form for Plaintiff, asserting Plaintiff could not work for the foreseeable future based on diagnoses of diabetes, GERD, hypercholesterolemia, bipolar disorder, ADHD, and chronic low back pain syndrome.  (Tr. 601–02.)  Plaintiff asked Dr. Goblirsch to complete a form again on February 17, 2010, this time indicating that his diabetes was controlled for purposes of maintaining his driver's license.  (Tr. 611–12.)  Plaintiff's diabetes was controlled at that time, and no medication changes were needed.  (*Id.*)

On March 30, 2010, Plaintiff saw Dr. Goblirsch and reported he was seeking Social Security Disability for his chronic low back pain.  (Tr. 608.)  Plaintiff told Dr. Goblirsch he remained out of work, and the character of his back pain had not changed.  (*Id.*)  Plaintiff also stated he had left heel pain for the past few days.  (*Id.*)  Dr. Goblirsch diagnosed Plaintiff with plantar fasciitis.  (Tr. 609.)  He also wrote a letter for Plaintiff, stating "Richard D. Miller has chronic low back

pain dating from June 2006.  Has been unemployed since 2006.  He has been treated at HealthPartners since." (Tr. 610.)

Approximately five months later, Dr. Michelle Karsten of Richfield Clinic-HCMC, completed a Medical Opinion form for Plaintiff on September 8, 2010, indicating that Plaintiff could not perform any employment in the foreseeable future due to diabetes, bipolar disorder, ADHD, and chronic low back pain. (Tr. 1121.)

On June 25, 2011, Dr. Thomas Jetzer of Occupational Medicine Consultants, Ltd. reviewed Plaintiff's medical records.  (Tr. 1118–19.)  He opined that Plaintiff had not been effectively treated for bipolar disorder or ADHD, and noted that Plaintiff had poorly controlled diabetes and GERD.  (*Id.*)  Dr. Jetzer noted that according to Plaintiff's 2009 functional capacity assessment, he was incapable of sedentary to light work, and his poorly controlled diabetes and mental disorders precluded him from safe driving.  (*Id.*)  Dr. Jetzer opined that Plaintiff was unemployable due to his combination of mental and physical impairments.  (Tr. 1119.)

At the request of the SSA, Plaintiff underwent a consultative examination with Dr. Azam Ansari on September 20, 2011.  (Tr. 1130–33.)  Plaintiff stated he was not on any medication for bipolar disorder or ADHD, and he was not under the care of a psychologist or psychiatrist.  (Tr. 1130.)  He had not had an MRI or x-ray for his lumbar spine.  (*Id.*)  And his last hemoglobin test revealed uncontrolled diabetes, but his reflux was under control.  (*Id.*)  On physical

examination, Dr. Ansari noted that Plaintiff's motor strength, sensation, and reflexes were normal, and he could firmly grip with both hands.  (Tr. 1132.)  In addition, Plaintiff's gait was normal, there was no tenderness at the lumbosacral spine and no muscle spasm, and his straight leg raise test was positive bilaterally at 60 degrees.  (*Id.*)  Dr. Ansari noted that Plaintiff's lumbar range of motion was somewhat limited, but his upper extremities were normal.  (*Id.*)  He also noted that Plaintiff had mild superficial varicose veins in the lower one-third of the leg and plantar calluses on both feet, and his ankle movements were unrestricted. (*Id.*)

After the examination, Dr. Ansari completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)."  (Tr. 1134–39.)  He opined that Plaintiff could frequently lift and carry twenty pounds, and occasionally lift and carry up to fifty pounds.  (Tr. 1134.)  He also opined Plaintiff could sit and stand two hours each without interruption, for a total of four hours each in an eight-hour workday.  (Tr. 1135.)  And Plaintiff could walk fifteen minutes at a time, and for a total of one hour per day.  (*Id.*)  In addition, Plaintiff could continuously use his hands, and occasionally use his feet for foot controls, and he could perform the following activities occasionally:  climb stairs, ramps, ladders and scaffolds, balance, stoop, kneel, crouch, and crawl.  (Tr. 1136–37.) However, Plaintiff could never be exposed to vibrations and could only occasionally be exposed to unprotected heights, moving mechanical parts,

operating a motor vehicle, humidity, dusts, odors, fumes and pulmonary irritants, and extreme heat and cold.  (Tr. 1138.)

## B.   Function Reports

On September 20, 2007, Plaintiff completed a function report for the SSA where he stated that following.  (Tr. 132–39.)  His diabetes caused urinary frequency.  (Tr. 132.)  He tried to walk when his legs were not hurting.  (*Id.*) When he bent down or squatted, he could not get back up.  (*Id.*)  He could not lift a bag of groceries or his laundry.  (Tr. 132, 134.)  He performed his personal grooming with difficulty.  (Tr. 133.)  He prepared simple meals twice a day. (Tr. 134.)  And he went out three times a week, using public transportation. (Tr. 135.)  In addition, he stated that his only hobby was listening to music, he spoke to people on the phone once or twice a week, he did not get along with his family and had only one friend, and he did not trust authority figures and had lost jobs due to problems getting along with people.  (Tr. 136–38.)

Plaintiff's friend, Trevor Hilst, completed a third-party function report regarding Plaintiff on September 21, 2007.  (Tr. 161–68.)  He corroborated what Plaintiff reported on his own function report.  (*Id.*)

## III.   Testimony at the Administrative Hearing

## Plaintiff's Testimony

Plaintiff, represented by counsel, testified at a hearing before the ALJ on August 8, 2011, as follows.  (Tr. 407.)  He graduated high school and went to college for one year.  (Tr. 411.)  He lived alone and did not have any children.

(*Id.*)  His condition worsened since his last hearing.  (Tr. 411–12.)  He had

depressive episodes and trouble sleeping.  (Tr. 416.)  His attention deficit

disorder prevented him from concentrating for long periods of time.  (*Id.*)  His

emotional problems prevented him from multi-tasking, and his circulatory

problems prevented him from using a computer for long periods.  (*Id.*)  And he

easily became tired and unfocused, needing a break from work after five

minutes.  (Tr. 419–20.)

Plaintiff testified that his back pain was most severe when standing, so he

had to alternate sitting and standing.  (Tr. 420–21.)  He stated he could only

stand for about five minutes at a time, and sit comfortably for less than an hour.

(*Id.*)  He could walk less than half a mile and he could not bend, squat, or kneel.

(Tr. 421–22.)  He stated that his friend helped him carry groceries because he

had trouble lifting.  (*Id.*)  And his hands cramped when he used a computer or

held a utensil for more than a couple minutes.  (Tr. 422–23.)  He only did laundry

once a month, and it was very difficult for him.  (Tr. 424.)  And he could only read

a couple pages at a time because he fell asleep.  (*Id.*)  He watched television, but

he had to stand up and walk around without overexerting himself.  (Tr. 425.)

Several times a month, Plaintiff canceled errands or appointments because he

was too tired or lacked energy to go out.  (Tr. 426.)  Plaintiff stated that his only

exercise was stretching.  (Tr. 428.)

Plaintiff testified that he spent most of his days watching television and

dozing off, and his only activity was going to the grocery store.  (Tr. 412, 417.)

He sometimes drove his friend's car on outings, but he did not drive very far because his leg would cramp.  (Tr. 413.)  He stated that he did not see his family members, and he had not been to the library, where he used to go often, for six months.  (Tr. 414, 417.)  He also stated that he had not looked for work since his last visit with Dr. Goblirsch because employers would not consider someone who had not worked for five years.  (Tr. 418.)  His only income for the last five years was from General Assistance.  (Tr. 414.)

Plaintiff testified that he lost his last job because he could not perform his job duties, and the longest that he ever held a job was seventeen months because he could not do the same thing over and over again.  (Tr. 415.)  He stated that in 1996, he had twenty-one jobs.  (*Id.*)  He was let go from the jobs for different reasons, including for working too slowly, for having an inability to concentrate on tasks, and for getting mad at people.  (Tr. 429–30.)  In addition, Plaintiff had been fired for things he said to customers, for not getting along with supervisors, and for getting traffic tickets on a job that required driving.  (Tr. 431–32.)

**Medical Expert's Testimony**

Dr. Karen Butler testified as a medical expert at the hearing.  (Tr. 433, 388.)  She testified that Plaintiff was diagnosed with mental disorders that fell under Listings 12.02, 12.04, 12.06, and 12.08, including ADHD, bipolar disorder,

major depression, generalized anxiety disorder, and personality disorder.[6]

(Tr. 433.)  The ALJ asked Dr. Butler to rate the severity of the paragraph B

criteria under the listings.[7]  (*Id.*)  Dr. Butler testified Plaintiff had mild impairment

in activities of daily living; moderate impairment in social functioning; moderate

impairment in concentration, persistence, or pace; and no episodes of

decompensation.  (Tr. 433–34.)  Dr. Butler opined that Plaintiff would be limited

to unskilled or lower semi-skilled work, with no rapid assembly line, brief and

superficial contact with others, and where servicing the public was not a primary

job task.  (Tr. 434.)

---

[6]      12.02 is the listing for organic mental disorders, 12.04 is the listing for
affective disorders, 12.06 is the listing for anxiety-related disorders, and 12.08 is
the listing for personality disorders.  20 C.F.R. Part 404, Subpart P, Appendix 1.
These listings contain a set of medical findings (paragraph A criteria),
impairment-related functional limitations (paragraph B criteria), and 12.02, 12.04,
and 12.06 have additional functional criteria (paragraph C criteria).  *Id.*
§ 12.00(A).

[7]      A mental disorder listing is met "if the diagnostic description in the
introductory paragraph and the criteria of both paragraphs A and B (or A and C,
when appropriate)" are satisfied.  20 C.F.R. Part 404, Subpart P, Appendix 1
§ 12.00(A).  Severity of functional limitations are assessed using the four criteria
in paragraph B:  (1) activities of daily living; (2) social functioning;
(3) concentration, persistence, or pace; and (4) episodes of decompensation.  *Id.*
§ 12.00(C).  The word "marked," as a standard for measuring severity of
limitations, means more than moderate but less than extreme.  (*Id.*)  To meet the
paragraph B criteria the impairment must result in at least two of the following:
marked restriction in activities of daily living; marked difficulties in maintaining
social functioning; marked difficulties in maintaining concentration, persistence,
or pace; or repeated episodes of decompensation, each of extended duration.
*See* § 12.04(B).

**Vocational Expert's Testimony**

J. Harren testified at the hearing as a vocational expert.  (Tr. 434, 592.)
The ALJ posed a hypothetical vocational question to Harren about a person who
was 44–50 years old with a high school education, work experience as a cashier,
who suffered from diabetes, heel bursitis, back pain, ADHD, depression with
bipolar disorder, anxiety, and personality disorder.  (Tr. 436.)  The person would
be limited to lifting and carrying twenty pounds occasionally and ten pounds
frequently.  (*Id.*)  He could perform all functional aspects of light work but without
exposure to heights, ladders, scaffolding, and only occasional bending, stooping,
twisting, crouching, and crawling.  (Tr. 436–37.)  The person would also be
prohibited from working on a fast paced assembly line or doing timed work; the
work must be unskilled to semi-skilled, with only brief and superficial contact with
others; and servicing the public could not be a primary task.  (Tr. 437.)

Harren testified that such a person could not perform Plaintiff's past
relevant work but could perform other work in the national economy.  (*Id.*)  She
cited examples of light cleaner,[8] light packager,[9] and light assembler.[10]  For a
second hypothetical question, the ALJ told Harren to assume the individual would

---

[8]    *See* Dictionary of Occupational Titles Code ("DOT") 323.687-014, with
15,000 such jobs in Minnesota.

[9]    *See* DOT No. 559.687-074, with 7,500 such jobs in Minnesota.

[10]    *See* DOT No. 794.687-058, with 12,500 such jobs in Minnesota.

require frequent breaks during the workday and would likely miss two days of work per month.  (Tr. 438.)    Harren testified that there would be no work available for such a person.  (*Id.*)

Plaintiff's counsel also posed a hypothetical question to Harren adding further limitations to the first hypothetical of sitting no more than two hours per day, standing one hour per day, walking one hour per day, and no firm grasping with either hand.  (*Id.*)  Harren testified there would be no jobs available for such a person.  (*Id.*)  The ALJ then posed a final hypothetical question limiting the person to lifting or carrying ten pounds occasionally, five pounds frequently, and performing all aspects of sedentary work.  (*Id.*)  Harren testified there were jobs consistent with the hypothetical in assembly,[11] small-product inspection,[12] and packaging.[13]  (*Id.*)

## IV.    The ALJ's Findings and Decision

On October 31, 2011, the ALJ issued a decision concluding that Plaintiff was not under a disability, therefore denying Plaintiff's applications for disability insurance benefits and supplemental security income.  (Tr. 380–410.)  The ALJ followed the five-step evaluation set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The Eighth Circuit Court of Appeals

---

[11]    *See* DOT No. 713.687-018, with 6,000 jobs in Minnesota.

[12]    *See* DOT No. 726.684-050, with 4,000 jobs in Minnesota.

[13]    *See* DOT No. 712.687-018, with 3,750 jobs in Minnesota.

has summarized the five-step evaluation process as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998) (citation omitted).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 5, 2005.  (Tr. 385.)  At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus (type 2), bursitis of the heel, attention deficit hyperactivity disorder (ADHD), anxiety disorder not otherwise specified, bipolar disorder versus severe major depression, and personality disorder, NOS (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  (Tr. 385–86.)  And at step three, the ALJ determined that Plaintiff's physical and mental impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 386–90.)  Specifically, the ALJ stated that Plaintiff's mental impairments, singly or in

combination, did not meet or equal listings 12.02, 12.04, 12.06 or 12.08.

(Tr. 387.)  The ALJ determined that Plaintiff did not satisfy the paragraph B

criteria of these listings because he had only a mild restriction in activities of daily

living, moderate difficulties in social functioning, moderate difficulties in

concentration, persistence, or pace, and no episodes of decompensation of

extended duration.  (Tr. 387–89.)

> At step four, the ALJ found that Plaintiff had the RFC to perform:
>
> light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the
> following specific limitations:  the claimant is able to lift and carry up
> to 20 pounds occasionally and 10 pounds frequently as well as to sit,
> stand and/or walk each up to six hours in an eight-hour workday; he
> is limited to work where there would be no heights, ladders, or
> scaffolding; occasional bending; stooping; twisting, crouching,
> climbing or crawling; he could do work where there would be no fast
> pace or high production goals (meaning no fast-paced assembly line
> or timed piecework); can do work of an unskilled to semi-skilled
> nature only; limited to brief and superficial contact with others where
> servicing the public is not a primary task.

(Tr. 390).  In reaching this RFC determination, the ALJ found that Plaintiff's

physical examination records did not corroborate the level of restriction Plaintiff

alleged.  (Tr. 392.)  In addition, the ALJ noted that there was a significant gap in

Plaintiff's treatment with Dr. Goblirsch, who had not seen Plaintiff for a year prior

to his March 2011 appointment, and in March 2011, Plaintiff's condition was

stable and no changes in treatment were required.  (Tr. 393.)

The ALJ, in determining Plaintiff's mental RFC, relied greatly on

Dr. Butler's impartial medical testimony.  (*Id.*)  The ALJ found Dr. Butler's opinion

to be "generally consistent with the weight of the objective medical findings of

record throughout the applicable time period." (*Id.*)  The ALJ also noted that

Plaintiff's mental status examinations were quite unremarkable.  (Tr. 393–94.)

The ALJ noted that Plaintiff's GAF score in September 2007 was 55–60, and in

February 2008, Plaintiff was not taking any psychotropic medications.  (Tr. 394.)

In addition, the ALJ noted that overall Plaintiff's mental health treatment was

"sporadic and rare," which was inconsistent with Plaintiff's allegations of disabling

mental health symptoms.  (*Id.*)

      The ALJ also discounted Plaintiff's credibility for a number of reasons.

First, Plaintiff's treatment was routine and/or conservative in nature, and no

imaging or prescription medications were recommended for his back pain.  (*Id.*)

This was "highly inconsistent" with the level of pain Plaintiff alleged.  (*Id.*)

Second, Plaintiff did not follow up on treatment recommendations, such as

Dr. Bass's recommendation to make appointments for diabetic management.

(*Id.*)  Third, Dr. Bass expressed some doubts about Plaintiff's inability to work.

(*Id.*)  For example, in March 2007, Plaintiff told Dr. Bass he had been unable to

work for many months, but he could not explain why.  (*Id.*)  And in February

2008, Plaintiff told Dr. Bass he could not work due to back pain, but Dr. Bass

noted that Plaintiff had not had any specific treatment for back pain.  (*Id.*)  And

fourth, the ALJ noted there were medical records indicating Plaintiff was

manipulative and malingering when he reported extreme mental health

symptoms.  (Tr. 394–95.)  For example, Plaintiff sought hospitalization in July

2006, after his sister kicked him out of her house, but he was only suicidal when

threatened with discharge.  (Tr. 395.)  In addition, the ALJ found that Plaintiff's

work activity after the alleged onset date indicated that his daily activities were

sometimes greater than what he reported.  (*Id.*)  And further, Plaintiff continued to

look for work and participated in some retraining.  (*Id.*)  The ALJ also noted that

Plaintiff's work history overall was sporadic, raising the question of whether his

unemployment was due to something other than his medical impairments.  (*Id.*)

The ALJ explained what amount of weight she gave to the various medical

opinions in the record.  She gave Dr. Karayusuf's mental RFC opinion great

weight because it was consistent with Plaintiff's examination and with the "weight

of the objective findings of the claimant's other treating and examining providers

throughout the applicable time period . . ."  (Tr. 395–96.)  She gave Dr. Ansari's

physical RFC opinion little weight because he saw Plaintiff only once and did not

provide objective medical findings to support his sitting/standing, postural and

environmental limitations, and she did not find anything in the record to support

the limitations.  (Tr. 396.)  In addition, the ALJ noted that Dr. Ansari's

examination revealed few abnormalities.  (*Id.*)  The ALJ gave little weight to

Dr. Bass's opinions because they were conclusory and unsupported by objective

medical findings.  (*Id.*)  The ALJ noted that in February 2008, Dr. Bass indicated

back pain was not Plaintiff's primary problem, it was his personality disorder.

(*Id.*)  But Dr. Bass did not treat Plaintiff for mental problems, so he was not

qualified to offer an opinion on Plaintiff's mental problems.  (*Id.*)  The ALJ

rejected Dr. Abrar's opinions because the first time the opinion was submitted to

the SSA, it appeared to have been tampered with because a handwritten note was added to support disability.  (Tr. 396–97.)  The second submission of Dr. Abrar's opinion did not contain the handwritten note "will not be able to work at all" that was on the first copy of the opinion.  (Tr. 397.)  With or without the handwritten note, the ALJ noted that the opinion was inconsistent with Dr. Abrar's findings on examination, and apparently Dr. Abrar relied heavily on Plaintiff's subjective complaints.  (Tr. 397.)  In addition, the ALJ gave little weight to Dr. Goblirsch's opinions because there were no medical findings supporting the opinions, and he saw Plaintiff on a very limited basis.  (*Id.*)  For example, in June 2009, Dr. Goblirsch opined Plaintiff should remain off work due to chronic low back pain, but there is no evidence he examined Plaintiff's back at that time.  (*Id.*)

The ALJ also addressed the GAF scores of 42, 48, and 45 assigned to Plaintiff by his therapists, Ms. Waller and Mr. Powell.  (Tr. 398.)  The ALJ gave little weight to these scores because Ms. Waller had a limited treating relationship with Plaintiff, and the record reflects that although Plaintiff was anxious at the time, he was able to relate his symptoms coherently.  (*Id.*)  Additionally, the ALJ noted that a GAF score is "only a snapshot in time" and not reflective of the claimant's functioning over a significant period of time.  (*Id.*)

The ALJ also gave Dr. Jetzer's opinion very little weight because he had not treated or examined Plaintiff, he was not familiar with the Social Security Disability regulations, and his overall assessments were inconsistent with the objective medical record and Plaintiff's ongoing activities.  (Tr. 398.)  And the ALJ

rejected Dr. Karsten's opinion because the opinion was conclusory, and she was not Plaintiff's treating physician. (Tr. 398–99.) Even so, the ALJ found greater limitations than those opined by the state agency medical consultants[14] based on new evidence establishing greater limitations. (Tr. 399.)

Ultimately, at step four of the disability determination procedure, the ALJ found that Plaintiff was not capable of performing his past relevant work. (*Id.*) But at step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff can perform including jobs in cleaning, packaging, assembly, inspecting, and sedentary packaging. (Tr. 400.) Thus, the ALJ concluded that Plaintiff was not under a disability from August 5, 2005, as defined by the Social Security Act, through the date of the ALJ's decision. (*Id.*)

## DISCUSSION

### I.   Standard of Review

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)

---

[14]   The state agency consultants' opinions are found at Tr. 269–83, 288–95, 324–29.

(quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id.*  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff alleges three errors by the ALJ.  (Doc. No. 23, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 18.)  First, Plaintiff argues that the ALJ erred in finding Plaintiff did not meet or equal a listed mental health impairment at the third step of the disability evaluation process.  (*Id.*)  Second, Plaintiff contends that the ALJ erred at step five of the disability evaluation in ruling that Plaintiff could work.  (*Id.*)  And third, Plaintiff argues the ALJ's decision that Plaintiff could perform the specific jobs described at step five of the ALJ's analysis was not supported by substantial evidence in the record.  (*Id.*)

Plaintiff's argument concerning the ALJ's evaluation at step three is premised on the ALJ's weighing of the treating physicians' opinions and on her assessment of Plaintiff's credibility.  (*Id.*)  This analysis by the ALJ is also integral to the step four RFC determination.  *See Young v. Apfel*, 221 F.3d 1065, 1069

n.5 (8th Cir. 2000) ("RFC is determined at step four. . .").  Therefore, the Court addresses steps three through five of the disability evaluation process below.

### A.   Listed Impairments

Plaintiff asserts that the ALJ erred in finding that Plaintiff did not meet the B criteria of the mental disorder listings.  (Pl.'s Mem. 26–27.)  Plaintiff contends he has marked limitations in daily activities, social functioning and concentration, and persistence or pace, based on the medical records from his hospitalizations, his GAF scores in the 40s, his limited daily activities, social impairments demonstrated by his employment history, and difficulty concentrating due to ADHD and anxiety disorder.  (*Id.*)

Plaintiff was assessed with GAF scores in the 40s for a short period of time between April 2006 and July 2006, when Plaintiff became homeless after losing his job, and his sister would no longer allow him to live with her.  Understandably, this induced some depression and anxiety.  Just a day or two after Plaintiff was hospitalized for suicidal ideation, however, he was noted to be joking and laughing with others in the lounge all day.  Plaintiff's MMPI-2 test results indicated a "very increased likelihood" that Plaintiff was exaggerating his mental health symptoms.  Similarly, Plaintiff's MCMI-III tests results suggested Plaintiff may have overstated certain items.  Finding that Plaintiff was malingering, Dr. Sarabalas discharged Plaintiff from Abbott on July 11, 2006.

Plaintiff immediately sought admission at another hospital, and although he was admitted at Fairview, Dr. Vine noted malingering as a possible diagnosis,

and Plaintiff was discharged about a week later.  At that point, Plaintiff was irritable but not suicidal.  In fact, he did not seek further mental health treatment until September 2007, more than a year later, at which time his GAF score was 55–60, consistent with moderate mental health symptoms.  Because the evidence is consistent with Plaintiff malingering serious symptoms in order to be hospitalized instead of going to a homeless shelter, the ALJ did not err in finding Plaintiff's low GAF scores were not indicative of marked impairments in his mental functioning.  *See Davidson v. Astrue*, 578 F.3d 838, 845 (8th Cir. 2009) (stating that the ALJ properly discounted an allegation of disabling depression where there was evidence of malingering).

Under step three of the disability evaluation, Plaintiff also asserts that his daily activities are markedly restricted.  (Pl.'s Mem. 27.)  Throughout the medical records, however, Plaintiff attributes restrictions in his daily living primarily to pain, not his mental functioning.  As will be discussed below, Plaintiff's allegations of pain are not credible and do not support marked restrictions in his daily activities.  Plaintiff also alleges difficulty completing daily tasks due to anxiety and ADHD.  This is contrary to the majority of Plaintiff's mental status examinations indicating normal cognition.  *See Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) (affirming ALJ's credibility determination where multiple mental status examinations revealed no abnormalities).  Plaintiff's allegations of difficulty completing tasks due to anxiety and ADHD are also not credible due to Plaintiff's failure to regularly pursue treatment for these conditions.  Plaintiff told

his therapist he was going to pursue ADHD workshops, but there is no evidence that he did so.  And apart from his short hospitalizations in June and July 2006, Plaintiff received no treatment for anxiety.  An ALJ may discredit a claimant's subjective mental health complaints where the claimant did not attempt to obtain treatment, absent evidence that treatment was denied due to lack of insurance or payment.  *Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003).  Therefore, the ALJ did not err in discrediting Plaintiff here.

Plaintiff further asserts that his social functioning is markedly impaired because he does not get along with his family, he has only one close friend, and he has had many jobs from which he was fired.  (Pl.'s Mem. 27.)  The ALJ found that Plaintiff's social functioning was moderately impaired, citing a report that Plaintiff was chatty, social, joking, and laughing with others in the hospital; he was pleasant and cooperative in sessions with Mr. Siegel; he was cordial, polite, and cooperative with Dr. Karayusuf; and Plaintiff did not report any social difficulties that occurred during the applicable time period to his treating providers.  Despite Plaintiff's long history of difficulty holding a job, there is substantial evidence supporting the ALJ's determination that Plaintiff's social functioning was only moderately impaired during the applicable time period.  *See Halverson*, 600 F.3d at 933 (affirming the ALJ's determination where Plaintiff's mental status examinations were normal, and Plaintiff behaved appropriately in her interactions with others).

Substantial evidence also supports the ALJ's determination that Plaintiff's concentration, persistence, or pace is only moderately impaired.  None of Plaintiff's mental status examinations supported markedly impaired concentration, persistence, or pace.  Also inconsistent with marked impairments in concentration, Plaintiff told Nurse Nancy Nelson that he went to the library every day.  Furthermore, Plaintiff usually attributed his inability to work to his back and leg pain, not inability to concentrate or timely complete tasks.  Finally, Plaintiff sought and followed through with very little treatment for anxiety and ADHD.  *See Davis v. Barnhart*, 197 Fed. Appx. 521, 523 (8th Cir. 2006) (stating that failure to pursue mental health treatment supported ALJ's credibility analysis).

For these reasons, this Court concludes that the ALJ did not err in assessing the severity of Plaintiff's impairments under the paragraph B criteria of the listings.  But failure to meet or equal a listed impairment does not end the disability evaluation process.  This Court will therefore address Plaintiff's contentions that the ALJ erred in evaluating his credibility and his treating physicians' opinions.

## B.    Evaluation of the Opinion Evidence

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*,

201 F.3d 1010, 1012–13 (8th Cir. 2000)).  "Treating physicians' opinions are given less weight "if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  The ALJ must resolve conflicts between medical opinions.  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007.)  Unless the ALJ gives a treating source's opinion controlling weight, the ALJ considers the following factors in weighing all medical opinions: (1) examining relationship; (2) treating relationship; (3) supportability of opinion; (4) consistency; (5) specialization; and (6) any factors brought to the ALJ's attention.  *Id.* (citing 20 C.F.R. § 404.1527(d)).  Generally, a consulting physician's opinion does not constitute substantial evidence on the record as a whole, especially when it conflicts with a treating physician's opinion.  *Id.* (citing *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000).  Exceptions are made, however, when other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.  *Id.*

Plaintiff contends that his physical impairments support Dr. Bass's and Dr. Goblirsch's opinions that he is disabled.  (Pl.'s Mem. 20.)  Plaintiff asserts the only evidence indicating that he could perform the physical RFC found by the ALJ was Dr. Larson's consulting opinion, provided in a form that includes little or no detail explaining how he arrived at his conclusions.  (*Id.* at 21.)  Plaintiff

argues that the ALJ did not properly resolve the conflict between the treating physicians' opinions and the opinion of a state agency medical consultant.  (*Id.*)

The ALJ did not fully adopt Dr. Larson's opinion, but instead concluded that Plaintiff could perform a more limited range of light work based on (1) objective medical findings throughout the applicable time period; (2) discounting Plaintiff's subjective complaints because he required only routine, conservative treatment; (3) the fact that Plaintiff's physicians did not order imaging or prescribe pain medications; and (4) because Plaintiff's infrequent treatment and failure to follow up on recommendations were inconsistent with his allegations of disabling pain.  Further, contrary to the forms Dr. Bass completed, he expressed doubt over whether Plaintiff's back and leg pain prevented him from working.  Moreover, the forms Dr. Bass completed were conclusory and not specific enough to formulate a residual functional capacity.  And Dr. Goblirsch's opinions suffered the same inadequacies.  *See Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) ("[W]e have upheld an ALJ's decision to discount a treating physician's MSS [medical source statement] where the limitations listed on the form 'stand alone,' and were 'never mentioned in the physician's numerous records or treatment' nor supported by 'any objective testing or reasoning.'").

In addition, the ALJ discounted Dr. Abrar's opinion of Plaintiff's RFC because it was contrary to Dr. Abrar's examination findings.  Plaintiff was able to sit, stand, and walk, and there was no indication why he could not lift more than fifteen pounds or firmly grasp with his hands.  In the entire record, there were no

objective findings supporting Plaintiff's back pain, minimal findings supporting

foot or leg pain, and no findings supporting hand impairments.  And Plaintiff

sought evaluations for physical complaints infrequently, coinciding with occasions

when he needed a disability form completed for benefits.  *See Marciniak v.*

*Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995) (stating that claimant's minimal

attempts to seek medical treatment or effective medication were inconsistent with

a claim of severe constant pain).  Accordingly, this Court concludes that

substantial evidence in the record supports the ALJ's analysis of the various

physical RFC opinions.

Plaintiff also contends that the ALJ should have given more weight to

Ms. Waller's opinion of his mental RFC than to Dr. Karayusuf's mental RFC

opinion.  (Pl.'s Mem. 22–24.)  Plaintiff points out that the ALJ discounted Waller's

opinion because she had a very limited treating relationship with Plaintiff but

gave great weight to Dr. Karayusuf's opinion despite the fact that he had no

treating relationship with Plaintiff.  (*Id.* at 22–23.)  Plaintiff also contends that

Waller's assessment of his GAF scores and subsequent hospitalization supports

Waller's disability opinion.  (*Id.* at 23–24.)

The Court has addressed the low GAF scores Waller assigned to Plaintiff

before he was hospitalized in June and July 2006 above.  And Plaintiff never saw

Waller again after his hospitalizations.  Furthermore, Plaintiff received very little

mental health treatment after his hospitalizations.  When Plaintiff did seek

treatment, his mental status examinations were largely normal.  Dr. Karayusuf

limited Plaintiff to work with simple instructions and brief and superficial interactions with others.  This opinion is consistent with the record as a whole, including Waller's discussions with Plaintiff about his difficulty getting along with others at work.  Therefore, this Court concludes that substantial evidence in the record supports the ALJ's analysis of the competing mental RFC opinions.

### C.    Credibility Analysis

Plaintiff contends that it was improper for the ALJ to determine his back pain was not severe because he did not have imaging of his back.  (Pl.'s Mem. 24.)  An ALJ cannot discount a claimant's subjective complaints based solely on lack of objective medical findings to support the degree of severity alleged.  *Wagner*, 499 F.3d at 851.  The ALJ must consider all of the evidence relating to the subjective complaints including prior work record; observations by third parties and physicians relating to matters such as the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  *Id.* (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Here, the ALJ did not discount Plaintiff's back pain solely on the basis that Plaintiff did not have imaging, but also because his examinations were primarily normal, and he sought little or no treatment for his pain.  In March 2007, Plaintiff told Dr. Bass that his back and leg pain prevented him from working, but Dr. Bass noted that Plaintiff could not easily explain why he was unable to work

for so long because his leg pain was just a few months old. In September 2007, Dr. Bass stated "bipolar and ADHD which untreated are more likely causes of disability then [sic] back pain." In February 2008, Dr. Bass stated, "I think that his primary problem with work is less the back pain than his personality disorder." And in May 2008, Plaintiff told Dr. Bass that he was looking for work and undergoing job training. Based on the above, and this Court's review of the record, this Court concludes that the ALJ's decision to discount the credibility of Plaintiff's pain is supported by substantial evidence. *See Robinson v. Sullivan*, 956 F.2d 836, 839 (8th Cir. 1992) (stating that claimant's treatment history and testimony of his treating physicians contradicted his claims of disabling pain.)

Plaintiff also alleges the record contradicts the ALJ's finding that he did not follow a treatment plan for diabetes, as directed by Dr. Bass. (Pl.'s Mem. 25–26.) Plaintiff contends that he attended at least one diabetes education class, and his financial status and psychiatric disorders were barriers to treatment. (*Id.*) The record indicates, however, that Plaintiff was uncooperative with staff's attempts to manage his diabetes while he was in Abbott Northwestern Hospital, and when he was angry over his discharge from Abbott, he refused to take his diabetes medications with him. In addition, between October 2007 and August 2008, Plaintiff was not checking his blood glucose or following up on his diabetes. There is no indication that Plaintiff attempted to get treatment or evaluation for diabetes but was denied for financial reasons, nor is there any indication that Plaintiff's mental health prevented him from seeking such treatment. In fact,

Plaintiff was able to get his diabetes under control after he started following up with Dr. Goblirsch in August 2008.  Based on the above, this Court concludes that substantial evidence supports the ALJ's credibility finding.

### D.    Hypothetical Question and Vocational Expert Testimony

Plaintiff contends that the ALJ's hypothetical question to the vocational expert did not capture the concrete consequences of Plaintiff's impairments because the hypothetical did not include an inability to grasp with his hands. (Pl.'s Mem. 28.)  Plaintiff further contends that he cannot perform the jobs the ALJ identified as being "other work" in the national or regional economy that Plaintiff was capable of performing, including cleaning, packaging, assembly, inspector, and sedentary packaging.  (*Id.* at 29.)  Plaintiff asserts he cannot clean because he struggles to do his own cleaning; he cannot package because he cannot grasp, and he needs to constantly change position to avoid pain in his legs and back; he cannot inspect because it would require more than brief and superficial contact with others; and he cannot work generally because he cannot adapt to stress, pressure, and social interactions required by employment.  (*Id.* at 29–30.)

The record before this Court does not reflect that Plaintiff has any impairment that limits his abilities to use his hands.  In his disability report, he did not allege disability based on inability to grasp with his hands.  And he never sought treatment for problems with his hands.  This Court concludes that the ALJ properly determined Plaintiff's physical and mental RFC.  And the ALJ's

hypothetical question to the vocational expert—the response to which the ALJ relied on in determining Plaintiff could perform "other work" at step five of the disability evaluation—contained all of the impairments and limitations that the ALJ found to be true.  Under such conditions, the ALJ's decision is supported by substantial evidence in the record as a whole, and should be affirmed.  *See Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001) (citing *Miller v. Shalala*, 8 F.3d 611, 613–14 (8th Cir. 1993); *Andres v. Bowen*, 870 F.2d 453, 455–56 (8th Cir. 1989)).

Furthermore, the ALJ may rely on the vocational expert's testimony that inspector jobs do not require more than brief and superficial contact with others, because the vocational expert's testimony is not in conflict with the DOT.  *See Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007) (stating that the ALJ properly relied on the vocational expert's testimony, which was consistent with job description in DOT).  There is nothing in DOT Code 726.684-050, Film Touch-up Inspector,[15] for example, suggesting the job requires more than brief and superficial contact with others.

---

[15]    DOT Code 726.684-050 describes the job Film Touch-up Inspector as:

Inspects and repairs circuitry image on photoresist film . . . used in manufacture of printed circuit boards (PCB's): Inspects film under magnifying glass for holes, breaks, and bridges (connections) in photoresist circuit image.  Removes excess photoresist, using knife.  Touches up holes and breaks in photoresist circuitry image, using ink pen.   Removes and stacks finished boards for transfer to next work station.  Maintains production reports.  May place lint free

(Footnote Continued on Next Page)

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

      1.      Plaintiff's Motion for Summary Judgment (Doc. No. 21), be **DENIED**;

      2.      Defendant's Motion for Summary Judgment (Doc. No. 25), be

**GRANTED**; and

      3.      This case be **DISMISSED WITH PREJUDICE**, and judgment be

entered accordingly.


Date: December 10, 2013       _s/ Jeffrey J. Keyes_____
                                     JEFFREY J. KEYES
                                     United States Magistrate Judge


      Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 24, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  A judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute on order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.

---

(Footnote Continued from Previous Page)
      paper between dry film sheets to avoid scratching circuit images on
      film.

Dictionary of Occupational Titles, available at http://www.occupationalinfo.org/ 72/726684050.html.